**BUFFALO BROADCASTING COMPANY, INC., Kid Broadcasting Corporation, KWTX Broadcasting Company, Inc., Metromedia, Inc. and Storer Broadcasting Company, On Behalf Of Themselves and All Persons or Entities Who Own Local Television Stations which Obtain Music Performance Rights Pursuant to Music License Agreements With American Society of Composers, Authors and Publishers and/or Broadcast Music, Inc., Plaintiffs,**

v.

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, Stanley Adams, as President of American Society of Composers, Authors and Publishers, Cy Coleman, Hal David, Famous Music Corp., MCA, Inc., Morton Gould, Shapiro, Bernstein & Co., Inc., On Behalf of Themselves And All Other Members of American Society of Composers, Authors and Publishers, Broadcast Music, Inc., Al Gallico Music Corp., Paul Anka, Jerry Bock, Sheldon Harnick, Hollis Music, Inc., and Unart Music Corp., On Behalf of Themselves And All Other Affiliates of Broadcast Music, Inc., Defendants.**

No. 78 Civ. 5670.

United States District Court, S. D. New York.

Aug. 19, 1982.

Weil, Gotshal & Manges, New York City, for plaintiffs; Ira M. Millstein, James W. Quinn, R. Bruce Rich, Kenneth Steinthal, Roger B. Kaplan, Joseph Allerhand, Yvette Miller, New York City, of counsel.

Hughes, Hubbard & Reed, New York City, for defendant Broadcast Music, Inc.; Robert J. Sisk, Norman C. Kleinberg, Michael E. Salzman, Naomi F. Sheiner, Jacqueline D. Gilbert, William H. Voth, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants Sheldon Harnick, Al Gallico Music Corp., Hollis Music, Inc. and Unart Music Corp., et al.; Barry H. Garfinkel, Timothy A. Nelsen, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, and Bernard Korman, New York City, for defendants ASCAP, et al.; Jay Topkins, Allan Blumstein, Fred D. Heather, Andrew J. Peck, Alan L. Fischl, Richard H. Reimer, New York City, of counsel.

## OPINION

GAGLIARDI, District Judge.

The public performance of virtually every musical composition copyrighted in the United States is licensed by either the American Society of Composers, Authors and Publishers ("ASCAP") or Broadcast Music, Inc. ("BMI"). Each organization, representing thousands of individual copyright holders and music publishing companies, operates primarily through a blanket license, which provides the licensee with immediate, indemnified access to any and all songs in the organization's repertory in exchange for an annual fee ordinarily based upon a fixed percentage of the user's revenues. Recently, the Columbia Broadcasting System, Inc. ("CBS") raised an ultimately unsuccessful challenge under the antitrust laws to the blanket licensing system of ASCAP and BMI as it applied to television networks.[1] In this action, plaintiffs challenge the legality under the antitrust laws of the practices of defendants ASCAP and BMI in licensing music performing rights to local television stations,[2] and ask the court to enjoin the blanket licensing of performing rights to local television stations in order to permit the evolution of a performing rights licensing system characterized by competition between and among composers.

## I. Factual Background

### A. The Parties

The five named plaintiffs in this action own and operate one or more local television stations in the United States and rep-

---

1. Columbia Broadcasting System, Inc. v. American Society of Composers, Authors and Publishers, 400 F.Supp. 737 (S.D.N.Y. 1975), rev'd, 562 F.2d 130 (2d Cir. 1977), rev'd sub nom. Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), aff'd on remand, 620 F.2d 930 (2d Cir. 1980), cert. denied, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981).

2. A "local television station" is any commercial television station licensed by the Federal Communications Commission to broadcast a television signal, excluding the fifteen television stations owned and operated by one of the three television networks.

resent the class of all owners of local television stations in the United States who obtain music performing rights pursuant to license agreements with ASCAP and/or BMI. There are approximately 750 local television stations in the United States, owned by the approximately 450 members of the plaintiff class. The plaintiff class was certified by this court under Rule 23(b)(3), Fed. R. Civ. P., in a memorandum decision dated December 5, 1980. Only one owner—WSM, Inc., of WSM–TV, Nashville—has opted out of the class. While 65% of the owners of local television stations own only one station, the plaintiff class also includes corporations such as Metromedia, Inc. ("Metromedia") which owns and operates seven local television stations, including WTTV in Los Angeles and WNEW–TV in New York, and Storer Broadcasting Company which also owns and operates seven local television stations. Since 1949, the vast majority of local television stations has been represented by the All-Industry Television Station Music License Committee (the "All-Industry Committee") in their periodic negotiations with ASCAP and BMI regarding music performing rights licenses.

Defendant ASCAP is an unincorporated membership association of composers, authors and publishers of music formed in 1914 by Victor Herbert and several other composers to license the performance of its members' copyrighted music. At the time of ASCAP's formation, the users of copyrighted music—principally theaters, dance halls and taverns—were so numerous and widespread, and performances so fleeting, that it was impossible for individual composers and publishers to negotiate licenses with each user and to detect unauthorized uses. In addition, users who wished to perform compositions without infringing the copyright had no practical means of obtaining licenses from the copyright owners. ASCAP was formed as a "clearinghouse" for copyright owners and users to solve these problems. *BMI v. CBS,* 441 U.S. 1, 5, 99 S.Ct. 1551, 1555, 60 L.Ed.2d 1 (1979). Today, ASCAP has approximately 21,000 writer and 8,000 publisher members and licenses the performing rights in more than three million musical compositions to a wide variety of users including radio and television broadcasters, restaurants, nightclubs, concert halls and sports arenas. Defendant BMI is a non-profit corporation organized in 1939 by members of the radio broadcasting industry. BMI has more than 38,000 writer and 22,000 publisher affiliates, and there are approximately one million compositions in its repertory. Membership in ASCAP or affiliation with BMI is available to any composer or music publisher who meets certain minimal requirements. Both organizations' licensing practices also extend to foreign nations. ASCAP licenses on behalf of tens of thousands of members of approximately 40 affiliated foreign performing rights licensing societies who also license for ASCAP members in their countries. Similarly, BMI has reciprocal agreements with 39 foreign licensing societies pursuant to which it licenses music from their repertories in the United States and they license the works from the BMI repertory in their countries. As mentioned above, each organization operates primarily through the blanket license, which provides the licensee with the right to perform all of the compositions in the ASCAP or BMI repertory, as often as desired, upon payment of an agreed-upon fee.

The eleven individual defendants in this action represent two certified classes of defendants consisting of, respectively, all persons from whom ASCAP, and all persons from whom BMI, have obtained the right to license performing rights to third parties. Each ASCAP member and BMI affiliate enters into a standard membership or affiliate agreement by which ASCAP and BMI obtain the non-exclusive right to license the nondramatic performance of the composer's copyrighted work. Pursuant to these agreements, ASCAP and BMI obtain the authority to establish the forms of licenses to be offered, to fix the price and manner of payment, to adopt a royalty distribution system, and to distribute royalties among the members and affiliates. After deducting operating expenses, each organization

distributes all revenues to the members and affiliates at rates which reflect, among other factors, the nature and amount of the use of their music. Among the principal functions of both organizations is the monitoring and policing of unauthorized uses of their composers' copyrighted work.

As the Supreme Court commented in the *CBS* case, "both [ASCAP and BMI] plainly involve concerted action in a large and active line of commerce, and it is not surprising that, as the District Court found, '[n]either ASCAP nor BMI is a stranger to antitrust litigation.'" *BMI v. CBS,* 441 U.S. at 10, 99 S.Ct. at 1557 (quoting *CBS v. ASCAP,* 400 F.Supp. at 743). As early as 1934 the Department of Justice initiated antitrust litigation against ASCAP.[3] Following the filing in 1941 of criminal complaints which sought to enjoin ASCAP's exclusive licensing powers and to alter the blanket licensing format, the Government and AS-CAP entered into a consent decree which, as modified in 1950, still largely governs ASCAP's activities.[4] Under the amended decree, ASCAP may obtain only non-exclusive rights to license its members' works for public performances.[5] Further, the decree requires ASCAP to offer a "per program" license which differs from the traditional blanket license in that its fee is based on the licensee's revenues only for those programs which actually use the copyrighted music. The decree mandates that ASCAP set its fees for these licenses at rates which offer users a genuine choice between the licenses, prohibits ASCAP from insisting on the blanket license, and establishes a procedure whereby a licensee unable to agree upon a fee with ASCAP may apply to the District Court for the Southern District of New York for determination of a "reasonable fee."[6] The licensing practices of BMI

---

3. The action was ultimately discontinued. *See BMI v. CBS,* 441 U.S. at 10, 99 S.Ct. at 1557.

4. *United States v. ASCAP,* 1940–1943 Trade Cases ¶ 56,104 (S.D.N.Y. 1941).

5. The amended decree provides in relevant part:

IV. Defendant ASCAP is hereby enjoined and restrained from:

(A) Holding, acquiring, licensing, enforcing, or negotiating concerning any rights in copyrighted musical compositions other than rights of public performance on a nonexclusive basis;

(B) Limiting, restricting, or interfering with the right of any member to issue to a user nonexclusive licenses for rights of public performance.

6. The amended decree states in relevant part that ASCAP is:

(B) Ordered and directed to issue to any unlicensed radio or television broadcaster, upon written request, per program licenses, the fee for which

(1) in the case of commercial programs, is, at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the sum paid by the sponsor of such program for the use of the broadcasting or telecasting facilities of such radio or television broadcaster,

(2) in the case of sustaining programs, is at the option of ASCAP, either (a) expressed in terms of dollars, requiring the payment of a specified amount for each program in which compositions in the ASCAP repertory shall be performed, or (b) based upon the payment of a percentage of the card rate which would have been applicable for the use of its broadcasting facilities in connection with such program if it had been commercial, and

(3) subject to the other provisions of Section VIII, takes into consideration the economic requirements and situation of those stations having relatively few commercial announcements and a relatively greater percentage of sustaining programs, with the objective that such stations shall have a genuine economic choice between per program and blanket licenses;

(C) Enjoined and restrained from requiring or influencing the prospective licensee to negotiate for a blanket license prior to negotiating for a per program license.

VIII. Defendant ASCAP, in fixing its fees for the licensing of compositions in the ASCAP repertory, is hereby ordered and directed to use its best efforts to avoid any discrimination among the respective fees fixed for the various types of licenses which would deprive the licensees or prospective licensees of a genuine choice from among such various types of licenses.

IX. (A) Defendant ASCAP shall, upon receipt of a written application for a license for the right of public performance of any, some or all of the compositions in the ASCAP repertory, advise the applicant in writing of the fee which it deems reasonable for the license requested. If the parties are unable

parallel those of ASCAP and are similarly governed by a consent decree entered into in 1966 between BMI and the Government.

## B. *Local Television Station Programming*

There are approximately 750 local television stations currently in operation; of these, approximately 600 are network-affiliated and the others are independent.[7] Local television stations, whether network-affiliated or independent, have three principal sources of programming: network programming; syndicated programming; and locally-produced programming. Network programming is not at issue in this action and need not be discussed.[8]

Syndicated programming is defined as theatrical motion pictures, pre-recorded television programs and live television programs offered by producers and distributors for sale or license to a television station to be broadcast as a non-network program. Syndicated programs include made-for-television movies, series, cartoons, documentaries, news, sports and religious programs. Local television stations exercise no control over any of the creative elements of the production of syndicated programming. Although there is wide variation, syndicated programming typically comprises approximately 65–75% of the total non-network programming of local television stations. The bulk of syndicated programming is comprised of off-network programming, that is, pre-recorded programs previously broadcast on network television, and of motion pictures originally distributed theatrically. The remainder, or approximately 35%, is produced originally for syndication, and is known as first-run syndicated programming. The percentage of first-run programs varies widely among local television stations, ranging from 13% for one station (KPHO) to 85.9% for another station (WGAL). First-run syndicated programming has increased in importance in recent years; in 1981, first-run programs accounted for 43% of the 200 leading syndicated programs. Most local television stations own inventories of syndicated programs for which they own the broadcast rights. It was clearly established at trial that the broadcast of syndicated programming is essential to the successful and profitable operation of virtually all local television stations.

Locally-produced programming on the average occupies two to three hours of the local station broadcast day and typically consists of news shows, sports coverage and talk shows. There is, again, a wide variety in the amount of broadcast time devoted to locally-produced programming and in the contents of such programming. Each local station also broadcasts thousands of locally-originated commercials per year, of which substantial numbers are produced by the stations themselves.

From the early years of television through the 1950's, programming was predominantly "live." Since the mid-1960's,

---

to agree upon a reasonable fee within sixty (60) days from the date when such application is received by ASCAP, the applicant therefor may forthwith apply to this Court for the determination of a reasonable fee and ASCAP shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General. In any such proceeding the burden of proof shall be on ASCAP to establish the reasonableness of the fee requested by it. Pending the completion of any such negotiations or proceedings, the applicant shall have the right to use any, some or all of the compositions in the ASCAP repertory to which its application pertains, without payment of any fee or other compensation, but subject to the provisions of Sub-section (B) hereof, and to the final order or judgment entered by this Court in such proceeding . . . .

7. As is well-known, there are three national television networks owned by CBS, the National Broadcasting Company, Inc. and the American Broadcasting Companies, Inc. Each owns and operates five television stations in five of the top fifteen television markets in the United States and has 200 affiliated local stations which use network programming for a substantial portion of their broadcast day.

8. *See* note 16 *infra*.

the vast majority of local television stations' programming has been pre-recorded.[9]

## C. The Distribution of Syndicated Programming

Local television stations fill their syndicated programming needs from programs offered by syndicators (that is, both television producers and distributors). A critical issue in this action is whether it is the syndicator or the local television station that holds the bargaining power when syndicated programming is offered for sale or license in a given television market. There are hundreds of syndicators and thousands of syndicated programs available for purchase by local stations. A relatively small percentage of these programs, however, has had network runs sufficiently successful to make them attractive properties. Further, there is but a limited number of programs that have not had network runs which possess the recognized potential for popularity within a given market. Competition among local television stations for these "hot" properties is active. In most television markets there are three Very High Frequency ("VHF") local stations.[10] Syndicators frequently commence negotiations simultaneously with all local television stations in a particular market and there is always the possibility that, if the syndicator is unable to obtain its asking price in that market, it will bypass the market entirely. That threat may be particularly powerful in the smaller markets where distributors derive little revenue in any event. Although it is altogether unlikely that a syndicator would bypass one of the leading television markets, active competition among the television stations in the leading markets is maintained by the usually greater number of television stations in those markets. Thus, the court concludes on the basis of the credible testimony of several representatives of the local television stations that, despite the large number of syndicators and syndicated programming available to local stations, competition within each television market for the desirable programs on whose acquisition the viability of most local stations depends is vigorous.[11] The court further finds—and this is implicit in the preceding conclusion—that a single local television station usually has little leverage when negotiating with the syndicator of a desirable program.[12]

The evidence also establishes that the distribution market of syndicated programs is concentrated on eight leading companies.[13]

---

**9.** Defendants emphasize that, spurred by the increased use by syndicators of satellite distribution, in recent years there has been an increase in the number of syndicated programs broadcast live or on the same day they are produced. The amount of such programming remains insignificant.

**10.** Defendants stress that, due to the FCC's Prime Time Access Rule barring network stations from broadcasting off-network syndicated programs during prime time, even in New York, the nation's largest television market, there are only three VHF local commercial stations competing for syndicated programs to be shown during prime time. The existence of three potential buyers competing at any given time for a single product does not, to this court's view, undermine the finding below that competition among local stations for desirable syndicated programming is "vigorous."

**11.** This testimony was provided by: Lesley G. Arries of Buffalo Broadcasting Co., Inc.; James A. Stabile and Alfred L. Schwartz of Metromedia; Milford N. (Buddy) Bostick of KWTX–TV in Waco, Texas; Abiah A. Church of Storer Broadcasting Co.; J. Allen Jensen of KID–TV in Idaho; and George Willoughby of King Broadcasting Co. in Seattle. Defendants did not, in order to rebut the testimony, produce as witnesses at trial any of those syndicators who defendants assert deal with local television stations from weak bargaining positions.

**12.** The court is cognizant of the fact that, as defendants emphasize, many owners of local television stations own stations in more than one market. That fact does not alter the court's conclusion that local television stations lack bargaining power over distributors of desirable syndicated programming for the reason that individual stations, even though commonly owned, do not generally engage in "group buying" of syndicated programs.

**13.** These companies are: Viacom Enterprises, MCA/Universal, Columbia Pictures Television, Paramount Television Distribution, Warner Bros. Television Distribution, United Artists Television, Inc., Twentieth-Century Fox Television and MGM Television. These eight companies also control a sizable but smaller propor-

In 1981 these companies distributed 52% of all syndicated programs (not including motion pictures produced initially for theatrical exhibition) and 82% of the off-network syndicated programs. The broadcast of some of the syndicated programming distributed by these companies is essential to the successful, profitable operation of most local television stations. This concentration in the distribution market lends additional support to the conclusion that, within each television market, the distributor is often in a powerful bargaining position vis-a-vis the local television station seeking to purchase syndicated programming, particularly with regard to desirable off-network programs.

### D. *Local Television Stations' Use of Music*

The use of music in local television station broadcasts may be categorized as either feature, theme or background. Feature music is music which is the principal focus of audience attention, *e.g.,* a song sung by a performer on camera. Theme music is music used either to introduce and/or close a program or as part of a program. Background music is music used to complement action on the screen. Virtually all programs broadcast on local television stations make some use of music and the predominant portion of that music use consists of background and theme music. While the composition of background music may often require great expertise and may significantly contribute to the overall entertainment value of a program, such music is usually interchangeable.

The vastly predominant portion of music contained in local television stations' non-network programming is found in the stations' syndicated programming. Virtually all syndicated programs broadcast by local television stations contain theme or background music, the substantial majority of which is in the ASCAP or BMI repertory.

A smaller but sizable portion of the stations' syndicated programming also contains feature music.[14] Producers control the selection or acquisition of the music contained in syndicated programs; local television stations have no input. The music recorded in syndicated programming is permanently integrated therein and the programs cannot be broadcast without automatically performing the music. A small but increasing portion of the syndicated programming broadcast domestically is produced in foreign nations. Most of the music contained in such programming is licensed by ASCAP and BMI.

Virtually all locally-produced programs contain theme music, some contain background music, and few contain feature music.[15] In contrast to their lack of control over syndicated programming, local stations have the ability to control music use in most of their locally-produced programs. To fill their music needs for local programming, local stations may acquire music from music production companies, music libraries, or background music services. The overwhelming majority of locally-originated commercials use theme or background music, the predominant portion of which is copyrighted and in the ASCAP or BMI repertory. The evidence established that music is decidedly less important to the overall entertainment value of most locally-produced programs than it is to the success of most syndicated programming. Nevertheless, local stations freely select music from the ASCAP and BMI repertories for their locally-produced programs because their blanket licenses permit them to do so without additional costs.

### E. *The Music Rights Licensing System*

To the extent that local television stations use copyrighted musical compositions, performing rights licenses permitting the

---

tion of the production market of syndicated programming.

**14.** Defendants assert that the number of first-run syndicated programs being broadcast which regularly contain substantial amounts of

feature music has increased since 1971. The increase does not yet appear significant.

**15.** Exceptions include live local concerts, parades, football games and ethnic or religious programs.

broadcast of such music must be obtained in order to avoid copyright infringement. In order to cover the performance of ASCAP and BMI music contained in their non-network programming,[16] all of the named plaintiffs and almost all other commercial television stations have entered into blanket license agreements with both ASCAP and BMI. Given the prevalence of both ASCAP and BMI music in the stations' syndicated programming, local television stations have been obligated to obtain performing rights licenses from both organizations. There is no evidence whatsoever that ASCAP and BMI compete against each other in the licensing of television performing rights to local stations.[17] By virtue of the blanket licenses obtained from ASCAP and BMI, local television stations are able to perform virtually all music copyrighted in the United States and elsewhere in the world without danger of infringement. Under the blanket license agreements entered into between ASCAP and BMI and the local television stations, the fees to be paid by each station historically have been computed as a percentage of the station's revenues less certain agreed-upon deductions. The blanket licenses currently offered by both organizations specifically provide that a local station may not exclude from its revenue base, for the purpose of determining its license fees, income derived from a program which contains music cleared "at the source"[18] by the program producer, unless the license at the source was issued by ASCAP or BMI. The fees payable by the local stations to ASCAP and BMI do not vary either according to the significance, quality and value of any music used in a particular program or according to the extent to which music in the ASCAP or BMI repertory is actually used.[19]

As mentioned above, pursuant to their respective consent decrees, ASCAP and BMI also offer per program licenses which permit local stations to perform any or all of the compositions in the organizations' repertories in exchange for a fee based on a percentage of the stations' revenues derived from the programs which contain ASCAP or BMI music. Under the per program license, local television stations do not pay fees for those programs whose music is cleared at the source. Currently, of the 750 local television stations, none holds a per program license with ASCAP and only two hold BMI per program licenses. The two principal reasons that the per program license is an unattractive alternative to the blanket license are: (1) its base percentage is several times higher than the percentage rate payable under the blanket license; and (2) its reporting provisions are onerous, requiring local television stations to report music use in all non-network programming whether or not ASCAP or BMI music is contained therein.

Though not party to this lawsuit, the syndicated program producers, who are engaged in the risky business of program production, have a pivotal role in the system under attack. These producers are the only persons in a position to determine the musi-

**16.** Music in the *network* programming broadcast by local television stations is covered by blanket licenses obtained by the networks from ASCAP and BMI and is paid for directly to the networks by local stations. Thus, the individual local television stations do not need to obtain additional music licenses in order to broadcast network programming.

**17.** There does exist a third performing rights organization in the United States, SESAC, Inc. ("SESAC"), which also issues blanket licenses to many local television stations. SESAC's repertory is insignificant compared to that of either ASCAP or BMI.

**18.** Licensing "at the source" (or "source licensing") refers to the practice by which producers themselves obtain the performing rights to the

music contained in their programs and then pass along these rights together with the program packages to television stations (usually via distributors). Music may be licensed at the source by producers in either composer-for-hire or pre-existing music situations.

**19.** The amount which local television stations pay ASCAP and BMI for their blanket licenses, although substantial, is but a small fraction of the stations' revenues. In 1980, local television stations paid $36.7 million in fees to ASCAP and $20.1 million to BMI. The networks, by contrast, in 1980 paid $15.2 million to ASCAP, and $7.8 million to BMI.

cal needs of each program and to negotiate over the price of music prior to its selection. Producers obtain music for their programs by two means: (1) by engaging a composer-for-hire to write original music; and/or (2) by obtaining a license from a music publisher or its agent (usually the Harry Fox Agency) for the right to use desired pre-existing compositions. The cost of obtaining music is typically 2% or less of the total production costs of a given program.

Most of the music contained in syndicated programs is created by composers engaged by the producers to compose music specifically for the programs. The ASCAP member or BMI affiliate hired to compose music for a program negotiates with the producer over the price of all rights to the music, with the exception of television performing rights. Principal among the rights that are negotiated is the "synchronization right," which is defined as the right to record or reproduce a copyrighted musical composition in timed relation or synchronization with the visual or other aural aspects of any program or work.[20] With respect to television performing rights, producers and composers typically agree that the composer is entitled to receive the writer's share of any performing rights royalties distributed by ASCAP or BMI, and that the publisher's share of such royalties shall be distributed to a music publisher of the producer's choice which is a member or affiliate of the composer's performing rights society, and which may be, and usually is, a subsidiary of or a company affiliated with the producer. Ultimately, the right to license the television performance of the composer's music passes to the composer's publisher and either AS-CAP or BMI, but does not pass to the producer.[21] The purpose and effect of this practice—which is the focal point of plaintiffs' attack—is to "split" the licensing of television performing rights from the licensing of all other rights in the music performed. While the price of all other music rights is negotiated directly between the composer and the producer and the rights are then granted to the producer who, in turn, passes the rights along with the program to the television station, television performing rights are licensed to the television station separately through AS-CAP and BMI blanket licenses. This practice of splitting the licensing of television performing rights from the licensing of all other music rights excludes the licensing of these performing rights from the negotiations between composers and producers regarding the licensing of all other music rights and, to that extent, insulates compos-

---

**20.** The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, recognizes the synchronization right as a distinct right exclusively exploitable by the copyright holder. Whereas a performing rights license is required each time a user, such as a local station, broadcasts a program in which copyrighted music is incorporated, a synchronization license is a one-time only license. Television synchronization license fees are usually between $150 and $500.

**21.** Under these composer-for-hire agreements, producers obtain television performing rights under the condition that the producers register the music with ASCAP or BMI publishing subsidiaries and then grant back a portion of the performing rights to the composers, all pursuant to the understanding that the producers will not assign the television performing rights in any manner which would abrogate or otherwise affect the composers' right to collect the writers' shares of the performing rights royalties to be distributed by ASCAP and BMI. The provisions outlined above reflect several elements of the industry-wide agreements negotiated in the 1960's between the Composers and Lyricists Guild of America and the Association of Motion Picture and Television Producers. Defendants assert that producers somehow emerge from this contractual labyrinth with the ability to license music performing rights directly to anyone. It is nonetheless clear that producers possess no such capacity (unless the capacity to which defendants refer is that of the producers' affiliated publishing interests to license the music directly to television stations). It was apparent throughout four weeks of testimony regarding the industry that under the present system there is no source licensing and that syndicators could not merely convey performing rights without engaging in any additional negotiations with composers or publishing companies. If further substantiation is needed, it is provided by the responses of syndicators to plaintiffs' requests for source licensing in which several syndicators stated that to fulfill plaintiffs' requests they would have to return to the publishers and composers and enter into new negotiations in order to secure television performing rights.

ers from the price competition between and among composers that underlies those negotiations.[22] This insulation of the licensing of performing rights from the price competition that bears directly upon the licensing of other rights takes place in a "buyers' market" in which there are currently numerous composers available to create theme and background music for syndicated television programs from among whom a producer may select. While the blanket licensing system insulates the licensing of performing rights from price competition between and among composers, it does not diminish competitiveness in the licensing of other music rights.

In those instances in which a producer of a pre-recorded program desires to use pre-existing copyrighted music, the producer negotiates for and obtains synchronization rights in such music in direct dealings with the copyright holder or his agent. In most such circumstances, the producer deals with the music publisher or the Harry Fox Agency, an organization which is operated by the National Music Publishers Association and which acts as an agent for about 3,500 music publishers. As with composer-for-hire transactions, in pre-existing music transactions the publisher (or the Harry Fox Agency) does not grant, and the producer does not obtain, licenses covering television performing rights.[23] Equally, while the licensing of synchronization rights in pre-existing music is characterized by price competition, there is no price competition between and among copyright holders with respect to the licensing of television performing rights in such music. By contrast, when the producer of a theatrical motion picture wishes to use pre-existing music, the producer negotiates for and obtains *both* synchronization and theatrical performing rights from the publisher or the Harry Fox Agency.[24] As with his syndicated television program producer counterpart, however, the theatrical motion picture producer is not granted television performing rights licenses for the music contained in his picture.

Plaintiffs also introduced evidence regarding the vested interests of the leading syndicators and publishers in the current licensing system. First, as mentioned above, many syndicators or their affiliates, including the eight major distributors previously discussed, typically own interests in one or more music publishing companies which are members of ASCAP or affiliates of BMI. The revenues which these leading syndicators receive from ASCAP and BMI royalties through their affiliated publishing interests are a tiny fraction of what they receive from syndication of their programs.[25] Second, the evidence clearly establishes that only a handful of leading composers secures the bulk of the benefits of the blanket licensing system. In 1979, only 13% of all ASCAP and BMI publishers received any television distributions and less than .8% received more than 75% of all ASCAP and BMI television performance royalties.[26]

---

**22.** Should producers and composers negotiate with regard to the licensing of television performing rights in addition to the other rights, there would be little, if any, added complexity to these composer-for-hire negotiations.

**23.** The publisher in this situation is analogous to the composer in the composer-for-hire situation; there appears to be no question that the publisher could, should he be so requested and so inclined, grant a performing rights license to the producer.

**24.** The reason for the absence of "splitting" in the licensing of music in theatrical motion pictures is that the practice was held unlawful under Sections 1 and 2 of the Sherman Act in *Alden-Rochelle, Inc. v. ASCAP,* 80 F.Supp. 888

(S.D.N.Y. 1948), *relief,* 80 F.Supp. 900 (S.D. N.Y. 1948).

**25.** The court is unable, on the basis of the disputed facts and figures presented, further to specify the extent of the producers' and distributors' affiliated interests in ASCAP and BMI.

**26.** There is, of course, no indication that it is because of the blanket licensing system that only a few composers earn royalties attributable to performance. of their compositions on local television station broadcasts. It may well be that in a source licensing system featured by price competition among composers these same composers would control the market.

## II.  Discussion

### A.  Introduction

■   Having set forth at length the context in which this action arises, the court turns to the claims of the parties and the legal standard applicable thereto.  Plaintiffs claim that the blanket licensing system as it applies to local television stations constitutes an anticompetitive restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1,[27] and misuse of copyright in violation of the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*[28]  The relief plaintiffs seek is an injunction precluding defendants ASCAP and BMI from offering blanket music performing licenses to local television stations and a declaration that defendants' licensing practices constitute misuse of copyright.[29]  Plaintiffs argue that the licensing of television performing rights through blanket licenses is needless, anomalous, inefficient and coercive.  To plaintiffs, the salient feature of defendants' blanket licensing system is the splitting of the licensing of television performing rights from the licensing of all other music rights at the source and the consequent absence of price competition between and among musical compositions.  Plaintiffs further contend that the very existence of the blanket license and the realities of the market prohibit them from securing by self-help a reasonable alternative.  The "brave new world" envisioned by plaintiffs is one in which, the blanket license having been enjoined, local television stations obtain music performing rights, as they now do all other music rights, from syndicators who have obtained licenses at the source from composers and publishers.  As for locally-produced programming, plaintiffs seek the opportunity to secure music performing rights directly from copyright holders.  Defendants' position is that this action is the off-network rerun of *CBS*, and as such must be dismissed.  Defendants dispute each of plaintiffs' premises, contentions and conclusions, and maintain that the blanket licensing system, freely-chosen and highly efficient, is neither a restraint of trade nor anticompetitive.  To defendants, the distinguishing feature of the blanket license is not the absence of price competition, which defendants dispute in any event, but rather the undeniable advantages of the system for both users and copyright owners.

*CBS* is, of course, the controlling precedent.  At issue in *CBS* was the legality under the antitrust laws of the blanket license as applied to television networks.  In the first phase of the lawsuit, the district court dismissed CBS' complaint, holding that the blanket license did not restrain trade due to the availability of an alternative, namely, direct licensing.[30]  *CBS v. ASCAP*, 400 F.Supp. 737.  The district court found that in view of CBS' enormous market power,[31] should CBS request music li-

---

**27.**  That section provides in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ."

**28.**  Plaintiffs' claim of copyright misuse is tangential to the focal antitrust claim and is mentioned only briefly below.  *See* note 45 *infra.*  The complaint also asserts claims that defendants monopolized the market for the licensing of performing rights to local television stations in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and that the blanket licensing system constitutes an illegal tying arrangement in violation of Section 1.  These claims were unmentioned both during the four-week trial and in the parties' very extensive pre-trial and post-trial papers.  The court accordingly regards the claims as abandoned and shall not consider them.

**29.**  The complaint additionally seeks treble damages.  In this bifurcated trial, the issue of liability was tried first with the issue of damages reserved pending decision on the issue of liability.

**30.**  It appears that by the term "direct licensing" the district court meant both direct and source licensing as defined in this opinion.  *See* 400 F.Supp. at 759–60, 768, 778.

**31.**  As the district court stated: "CBS is far more than a television network.  It is, as Michael Dann, former Senior Vice President of CBS in charge of programming testified, 'The No. 1 outlet in the history of entertainment' and 'the giant of the world in the use of music rights.'"  400 F.Supp. at 770.

censes directly, "copyright owners would line up at CBS' door," 400 F.Supp. at 768, and that CBS had failed to prove that there were unreasonable barriers to the transition from blanket licensing to direct licensing. On appeal, the decision of the district court was reversed by the Second Circuit, which held the blanket licensing system to be price-fixing unjustified by market necessity, a *per se* violation of the Sherman Act, and remanded with instructions to fashion a remedy that would preserve the blanket license in some situations. *CBS v. ASCAP,* 562 F.2d 130. The Supreme Court reversed the decision of the Second Circuit and remanded for reconsideration of the blanket licensing system under the rule of reason. *BMI v. CBS,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1. Rejecting the Second Circuit's strict *per se* approach, the Supreme Court emphasized the benefits of the blanket license, such as transaction costs savings, monitoring costs savings, unrestrained output, flexibility in the choice of musical material, and indemnification for users from liability for copyright infringement. On remand, the Second Circuit ruled that the blanket licensing system as it applied to CBS did not restrain competition and affirmed the district court's decision denying relief. *CBS v. ASCAP,* 620 F.2d 930 (2d Cir. 1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981).

■■ Under the rule of reason standard set forth by the Second Circuit, the court must conduct a two-part inquiry. The first issue is whether the blanket licensing system actually restrains competition in any way. Even though under the blanket license there may be no price competition among musical compositions, if potential competition exists outside the blanket license then it is customer preference, not defendants' practices, that causes the lack of competition. That is, if the blanket license has been chosen by users "in preference to realistically available marketing alternatives," 620 F.2d at 935, then it cannot be found that the blanket license itself has any impact on competition. Thus, the first issue specifically is whether there now exist realistically available alternatives to the blanket licensing of music performing rights to local television stations. The second issue, should it be found that plaintiffs have no realistically available alternative to the blanket license, is whether on balance the blanket licensing system's anticompetitive effects outweigh its pro-competitive effects. 620 F.2d at 934. Plaintiffs bear the burden of proof with regard to both issues. *CBS v. ASCAP,* 400 F.Supp. at 751; *see also CBS v. ASCAP,* 620 F.2d at 937.

### B. Are There Realistically Available Alternatives?

■ A threshold matter, crucial to the outcome of this issue, is the meaning of "realistically available." Plaintiffs' position is that an alternative is realistically available only if it is efficient and available immediately. Defendants offer as realistically available any alternative that is mechanically feasible regardless of time and expense. The court's definition lies between either extreme, but is closer to that proposed by plaintiffs. In considering the matter, three questions arise. The first question is how costly or inefficient a feasible alternative may be and still be realistically available. A "realistically available" alternative must, of course, be other than a merely "available" alternative. Within the class of available marketing alternatives, the sub-class of realistically available marketing alternatives should, by the plain meaning of the words, exclude those alternatives so costly or inefficient as to be impractical and unappealing to any user choosing freely. The Second Circuit provides a clue in its *CBS* decision when it states: "An antitrust plaintiff is not obliged to pursue any imaginable alternative, *regardless of cost or efficiency,* before it can complain that a practice has restrained competition." 620 F.2d at 936 (emphasis added). The court thus concludes that a realistically available marketing alternative is one that is reasonably efficient

and not unreasonably costly.[32] A second question is how much time may the transition to an alternative entail consistent with it being realistically available. Guidance is provided by *CBS*, where the Second Circuit found direct licensing realistically available although the changeover could take up to one year. 620 F.2d at 937–38; *see also* 400 F.Supp. at 759. Plaintiffs could not therefore offer as evidence of the non-availability of an alternative the resistance of producers or publishers to a suggestion that licensing practices be altered immediately. Where, however, the necessary machinery is already functioning, a reasonable changeover need not be lengthy and the probative value to plaintiffs of spurned invitations to change would not be vitiated by the immediacy of the demand. The third question is, in determining whether an alternative is realistically available, how many local television stations must the court postulate will seek to effect the transition to that alternative. It is conceded that by acting in concert local stations would risk antitrust liability, and the availability of an alternative should all local stations unite and demand a change is not at issue. Nor would it be appropriate, as plaintiffs appear to suggest, to consider the availability of an alternative should only one local station pursue negotiations, because the evidence indicates that, were stations left to their own devices, more than one station would seek source licensing. Rather, the court must assume that several or many local stations acting individually would demand alternative licensing and must consider the present availability of alternatives in that context.

### 1. Historical Background

Before considering the realistic availability *vel non* of each of the three principal alternatives to the blanket licensing system, the court considers briefly whether, historically, the blanket license was freely chosen by local television stations. The inquiry will not in any event answer whether the blanket license today is realistically available and freely chosen by the local stations because conditions and attitudes may have changed. Nevertheless, the inquiry may shed light on the underlying issue.

Contrary to defendants' assertions that local television stations have eagerly sought blanket licenses, the history of the negotiations between the parties indicates that local television stations have only acquiesced in the development and maintenance of the blanket licensing system. The first blanket license for television performing rights was offered in 1941, while the television industry was still in its infancy. Indicative of the state of the industry at the time, the first license was gratuitous. In 1948 ASCAP cancelled the 1941 license and notified the television industry of its intent to negotiate fees for music performing rights. One important element of the ensuing negotiations was the proposal by the television stations that the *Alden-Rochelle* doctrine[33] be extended to the broadcast of motion pictures on television. The attempt was unsuccessful and the television stations ultimately agreed to a blanket license without any carve-out provision for

---

**32.** Recently, in *F.E.L. Publications, Ltd. v. Catholic Bishop of Chicago,* 1982 1 Trade Cas. ¶ 64,632 (7th Cir. March 25, 1982), the Seventh Circuit adopted a standard of availability which appears similar to that advanced here. In rejecting a challenge to the blanket license offered by a single publisher of religious music to Roman Catholic parishes in the Chicago area due to the availability of marketing alternatives, the Court of Appeals stated: "Although inconvenience or expense may in some cases be barriers to the availability of alternatives, in this case we believe these factors are not so obstructive that they constitute legal impediments to [the] alternatives." *Id.* at 73,466. Specifically, the Seventh Circuit held that an alternative license offered by the same publisher was a realistically available and adequate alternative despite the fact that, unlike the challenged blanket license, the alternative would permit a church to use each song only one time and thus prohibit inclusion in custom-made hymnals. To the extent that the holding in *F.E.L. Publications* is inconsistent with the standard advanced here, the court finds *F.E.L. Publications* distinguishable by virtue of the fact that, in sharp contrast to the instant case, at issue there were the licensing practices of a *single* publisher in a comparatively miniscule market with substantially reduced capacity to offer licensing alternatives.

**33.** *See* note 24 and accompanying text *supra*.

motion pictures licensed at the source. Dissatisfied with the results of the 1948 negotiations, which were conducted principally by the networks, the local stations formed the All Industry Committee in 1949 to act as a collective bargaining representative in negotiations with ASCAP and BMI. In 1950, as discussed above, ASCAP and the Department of Justice entered into a consent decree which largely governs the actions of ASCAP today. Pursuant to the consent decree, in 1951 the All Industry Committee commenced an action known as the *Voice of Alabama* proceeding [34] in an effort to secure lower license rates, particularly in connection with the per program license. The action was settled in 1954.

In 1961, upon expiration of the previous license term, the All Industry Committee sought to negotiate with ASCAP a new form of license that would exclude from its coverage non-locally produced pre-recorded programs in order to allow for the development of source licensing for those programs. When the negotiations proved unsuccessful, the local stations commenced a second action pursuant to the consent decree, known as the *Shenandoah* proceeding, for an order directing ASCAP to issue the requested license. The district court dismissed the petition in 1962 and the Second Circuit affirmed in 1964.[35] The *Shenandoah* proceeding was not ultimately terminated until 1969, when the district court entered an order, on consent of the parties, which preserved the blanket license intact. The local television stations subsequently agreed upon extensions of the blanket license with both ASCAP and BMI through 1978. The instant action was commenced on November 28, 1978.

In the court's view, this brief survey demonstrates that, historically, the blanket license was not actively sought by local television stations. Rather, the blanket license was usually agreed to as a necessary compromise and its reign was punctuated by periodic litigation. The history of the parties' negotiations must also be viewed within the context of changing conditions. Through the late 1950's, most television programming was live. Given the concededly greater benefits the blanket license offers to broadcasters of live programming, it follows that during the 1940's and 1950's when the blanket license became an institution local stations had less incentive than now to seek an alternative form of licensing. Nevertheless, alternatives were sought even then. In sum, the history of the parties' negotiations offers no support to defendants' contention that the present licensing system has been created by plaintiffs and that the blanket license has been and is freely chosen among realistically available alternatives. In fact, the historical evidence is to the contrary.

### 2. The Per Program License

There is no question that the per program license is feasible and available. As discussed above, its availability is mandated by the 1950 consent decree and there are two stations that hold BMI per program licenses. There are also 748 stations that have not chosen the per program license. The question before the court is whether the per program license has been a realistic alternative to those 748 stations that use the blanket license.

The per program license is a variant of the blanket license, the principal difference being that fees for the per program license are charged only for those programs containing copyrighted music. Programs containing music licensed at the source are also not charged. Like the blanket license, the per program license permits access to any song in the organization's repertory and reduces transaction costs. Equally, under the per program license there is no direct price competition between and among composers and compositions. Unlike the blanket license, the per program license saddles users with onerous reporting obligations.

**34.** *United States v. ASCAP (Application of Voice of Alabama, Inc.).*

**35.** *United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.),* 331 F.2d 117 (2d Cir.), *cert. denied,* 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964).

In addition, per program rates are seven times higher than those payable under the blanket license. For these reasons, only two of 750 stations have chosen the per program license.

■ Defendants maintain that comparisons demonstrate the superiority of the blanket license, not the deficiencies of the per program license. The court does not agree. Though feasible and available, the per program license has never been a viable alternative for local television stations. The record before the court reveals that the cost and burden of the per program license's record-keeping and reporting requirements render the license an alternative that more than 99.7% of all local television stations do not consider seriously. Each of the economists that testified at trial stated that given its recording and reporting requirements the per program license is a costly and inefficient alternative. This testimony was substantiated by the local station representatives. Further, it appears that throughout the parties' negotiations neither side regarded the per program license as offering a genuine economic choice. It is a stipulated fact that the *Voice of Alabama* proceeding was settled in 1954 on the express understanding that few stations would select the per program license. Under these circumstances, the per program license does not, as defend- ants argue, become a realistically available alternative merely by virtue of the fact that local stations can initiate litigation under the 1950 consent decrees concerning the terms of the license. Even were the rates lowered by resort to litigation under the consent decree, the court is unaware of how the burdensome record-keeping and reporting requirements could be significantly altered. Though the consent decree seeks to guarantee that users will have a "genuine economic choice" between the blanket and per program licenses, the trial testimony revealed that the guarantee is not meaningful in the marketplace. The court therefore concludes that the per program license is too costly and burdensome to be a realistic alternative to the blanket license.[36]

### 3. Direct Licensing

Direct licensing is the system by which television stations, having obtained a syndicated program or having themselves produced a program, directly contact each composer or agent or publisher that owns the television performing rights to the music contained in the program in order to obtain the music rights without the need of a blanket license from ASCAP or BMI. Plaintiffs contend that direct licensing is not a realistically available alternative to the blanket license with respect to the music contained in syndicated programming[37]

---

**36.** The court's conclusion with regard to the per program license is not at odds with that of the district court in *CBS v. ASCAP,* 400 F.Supp. at 778–79. The court in *CBS* cited the per program license as a feasible changeover mechanism in view of (1) the per program license's carve-out provision for programs containing only music licensed at the source, and (2) CBS' concession "that it could license the music for most of its entertainment programs without difficulty by requiring the program packager to deliver performance rights together with the rest of the package." 400 F.Supp. at 778. As discussed below, the major distinction between this case and *CBS* is that local stations do not have the market power or resources to compel source or direct licensing. The district court's finding in *CBS* that the per program license was available as a transitional device is therefore distinguishable. Further, the district court's concern in *CBS* that because CBS had not even negotiated a per program license it could not complain about hypotheti- cally burdensome terms is also not applicable here. The court in *CBS* expressly distinguished the networks from local stations which had, in fact, negotiated per program terms. ASCAP's argument that, as in *CBS,* its per program license does not exist is unavailing. ASCAP may not be insulated by the fact that the per program license has fallen into disuse since local stations' last effort to alter its terms.

**37.** Plaintiffs do not contend that direct licensing is not a realistic alternative for locally-produced programming. Since local television stations deal directly with the composers or copyright owners of the music contained in locally-produced programs, stations would not encounter difficulties in finding and obtaining music licenses from those composers and copyright owners. Of course, as long as the blanket license exists, direct licensing of the locally-produced portion of local station broadcasting is not commercially feasible due to the double

principally because it would be unreasonably impractical and expensive for local stations to search for and obtain licenses from thousands of composers and publishers. The trial testimony did establish beyond a doubt that it would be unreasonably costly and inefficient for local television stations to track down and negotiate performing rights licenses with the thousands of composers and publishers whose music is contained in the syndicated programming broadcast by local television stations and that direct licensing, were it to entail such nationwide searches and multiple negotiations, would not be a realistically available marketing alternative to the blanket license. Defendants contend, however, that alternative machinery would arise, should direct licensing be actively pursued by local television stations, that would render direct licensing reasonably efficient and therefore a realistically available alternative. Specifically, defendants point to the Harry Fox Agency, which on behalf of publishers now licenses to producers the synchronization rights for nearly all of the pre-existing music performed in movies and television shows in the United States, and argue that in response to a perceived demand for direct licensing the Harry Fox Agency would expand its operations to include performing rights.

There is no question either that the Harry Fox Agency could expand to license performing rights or that another agency could be established by publishers to accomplish the task. The question is whether the record supports the contention that either the Harry Fox Agency or another agency would, to accommodate the desires of local television stations, develop machinery that would permit direct licensing to replace the present blanket licensing system. The court finds that the record does not support this contention. To the contrary, the infer-

ence to be drawn from the evidence is that the efforts of local television stations to bring about direct licensing machinery would be thwarted due to their lack of power in the music industry. Comparison with *CBS* is instructive. Faced with a similar argument, the district court in *CBS* concluded that the necessary machinery for direct licensing would arise within a reasonable period and that direct licensing was accordingly an available alternative for CBS. 400 F.Supp. at 962–68. The district court's conclusion was based on its finding that CBS and its affiliated program producers could, by demanding direct licensing, bring to bear sufficient market power to stimulate either expansion within the Harry Fox Agency or the creation of a new agency to license television performing rights on behalf of thousands of composers and publishers. As the court reasoned, the formation of a centralized agency to handle performing rights transactions would obviate the need copyright holders would otherwise have to line up at CBS' door. That reasoning underscores the crucial factual differences between these two lawsuits. In the instant case, the trial testimony made clear that local television stations acting individually and severally would possess no such awesome power over copyright. owners. Since no lines would form at the doors of local television stations, no centralized machinery would arise to facilitate direct licensing. The record reveals that no agency that represents publishers could be expected to submit to the demands of local stations to alter its licensing system should those demands conflict with the wishes of publishers. It is equally clear that composers and publishers are content with the present licensing system and, absent a degree of pressure that several local stations could not exert, would not seek to undermine the system.[38] Lacking power over publishers,

payment situation that would arise. Given the double payment snare, direct licensing would not be a realistically available alternative unless the blanket license were discarded entirely.

**38.** The court does not hereby resurrect the "disinclination" theory rejected in *CBS*. The district court in *CBS* found that copyright owners

would not be disinclined to deal directly with CBS in view of CBS' market power. The district court did not find that absent CBS' power copyright owners would be inclined to change the system. It is the latter situation that is presented here.

local stations could neither compel a change in the Harry Fox Agency, *see* Berman Dep. 253; Brackman Dep. 58, nor stimulate creation of a new agency to represent publishers in direct licensing negotiations. There is an additional distinction with *CBS.* Beyond its power over copyright owners, CBS has considerable leverage over the producers whose programs it broadcasts. The court in *CBS* posited that both CBS itself and CBS producers would apply pressure on the Harry Fox Agency to expand its operations and it is reasonable to assume that the Agency would be responsive to pressure from the producers to whom it traditionally licenses music rights. Local stations have no such connections to syndicators and there is no basis to conclude that the Harry Fox Agency would respond to requests from various local station representatives to license performing rights in the same way as it would to concerted demands by CBS producers familiar to the Agency.

The court therefore finds that unlike CBS, local television stations could not by virtue of their market power effect the transition to a reasonably practical, centralized system of direct licensing.[39] Individual transactions with numerous copyright owners are not realistic. The court accordingly holds that for plaintiffs direct licensing is not a realistically available marketing alternative to the blanket license.

### 4. *Source Licensing*

The current availability and comparative efficiency of source licensing have been the focus of this lawsuit. Plaintiffs maintain both that source licensing is not now an available alternative to the blanket license, and that, should the blanket license be enjoined, source licensing would naturally evolve as the most efficient licensing system. The latter contention shall be considered in the next section. In considering the former contention the court shall first assess the probative value of plaintiffs' recent efforts to achieve source licensing by written request to producers and distributors and then analyze the ability of local television stations to achieve source licensing under present market conditions.

During the long discovery phase of this litigation, counsel for defendants on more than one occasion invited plaintiffs to approach producers and request source licensing. Plaintiffs eventually did, sending out more than 200 written requests that producers secure music performing rights at the source from composers and publishers. The parties' interpretations of what ensued differ extraordinarily. What is certain is that source licensing did not supplant the blanket licensing system; beyond that, the results are disputed. Plaintiffs contend that their requests were flatly rejected by all but 25 insignificant syndicators. Defendants argue that the responses of the syndicators demonstrate their willingness to negotiate changes in the licensing system, but that plaintiffs were not willing to negotiate in good faith. The parties' essential disagreement concerns the motives of the local stations. According to defendants, plaintiffs' requests were nothing other than disingenuous attempts to garner refusals in order to create a record for this lawsuit. Defendants stress in particular that plaintiffs never quoted any prices that they would be willing to pay for television performing rights. Plaintiffs counter that it was the sellers' obligation to initiate price negotiations and that the syndicators' carefully-phrased rejection letters were composed solely for the benefit of the court. The court declines to choose between these contrary versions of the conversations and correspondence exchanged between local stations and syndicators, and instead finds

---

**39.** The court reaches this conclusion notwithstanding the fact found so probative in *CBS* that plaintiffs have never attempted to achieve direct licensing. In view of the court's findings that direct licensing is utterly unrealistic without centralized machinery and that the probability that such machinery would be created at the behest of local stations is remote, it would be unreasonable to draw any inferences unfavorable to plaintiffs' claims due to the absence of such self-help efforts. Plaintiffs did, in any event, pursue the alternative they ultimately seek to bring about. Those efforts to achieve source licensing are discussed in the following subsection.

plaintiffs' source licensing foray so darkened by the shadow of the approaching trial that its results may not be relied upon to support either side. Nevertheless, the court believes that it can glean from the syndicators' responses certain significant facts that will be discussed below. An additional consequence of plaintiffs' self-help effort, albeit tainted, is that it avoids the difficulty encountered by the plaintiff in *CBS,* where it was found that the claim that an efficient alternative was not realistically available was seriously prejudiced by the fact that the plaintiff had never actually tried to attain the alternative. *See* 600 F.2d at 935–36; 400 F.Supp. at 752–53.

The court has already set forth its conclusion that local stations possess little bargaining power over syndicators offering desirable programming. If unsatisfied with one station's terms for the purchase of a syndicated program, the syndicator has the commercially available option to sell the program to a competitor station in that market or perhaps to bypass the market entirely.[40] It is not, however, a viable option for local television stations to bypass desirable syndicated programs when offered for sale or license without television performing rights in the music contained therein. It logically follows that should individual local stations, not acting in concert, request or demand that a syndicator alter its established practices and package its program with the music performing rights, the syndicator would not find itself compelled to do so. This conclusion is supported as well by the testimony of several local television station representatives that local stations are in no position to dictate syndication terms to syndicators and by the responses of syndicators to plaintiffs' requests for source licensing. Those responses make clear, even given the problems

discussed above, at the least that syndicators are not susceptible to moderate pressure from the local television station industry and that syndicators are more concerned by the prospect of abandoning longstanding business methods than by the possibility of disappointing their local station customers. While cognizant of the fact that plaintiffs bear the burden of proof with respect to all issues, the court finds it significant that defendants produced at trial no syndicators to rebut both the testimony of local station representatives and the evidence that may be culled from the syndicators' written responses.

The question therefore is whether syndicators would willingly change to a source licensing system. Nothing in the record indicates that they would; indeed, the evidence is to the contrary. Initially, there is the matter of inertia. Absent compulsion or premium prices that local stations could not pay, syndicators would have no impetus to depart from their standard practices and request and pay for television performing rights merely in order to pass them along to local stations. The importance of this inertia is apparent in most of the responses of syndicators to plaintiffs' source licensing requests. In addition, most of the leading syndicators, because of their affiliated publishing interests, have an interest in ensuring the maintenance of the lucrative blanket licensing system. That interest is not denuded by the fact that syndicators' music royalties are a small fraction of their syndication revenues because under the present system syndicators need not choose between their syndication revenues and the royalties earned by their affiliated publishing companies.

The court therefore finds that plaintiffs can neither compel source licensing by de-

---

**40.** Defendants argue that this line of reasoning tracks the "competitive disadvantage" theory rejected in *CBS.* Defendants are incorrect. The Court of Appeals in *CBS* ruled that direct licensing could not be held unavailable merely because CBS would find itself at a competitive disadvantage vis-a-vis the two other networks if CBS were to change to direct licensing while the other two remained under the blanket

license. 620 F.2d at 938 n. 9; *see also* 400 F.Supp. at 764. In the instant case, by contrast, the court finds that local stations could not bring about source licensing due to the competitive disadvantage that those stations demanding source licensing would suffer vis-a-vis those that did not. The court's reasoning is clearly distinct from that rejected in *CBS.*

manding it nor achieve source licensing by requesting it. Those with the incentive to change the system lack the power; those with the power lack the incentive. There is no realistically available marketing alternative to the blanket license.

### C.  Is the Blanket Licensing System Anticompetitive?

■ Having concluded that local television stations have not freely chosen the blanket license among realistically available marketing alternatives, it remains for the court to determine whether the blanket licensing system unreasonably restrains the licensing of music performing rights to local stations.[41] To that end, the court shall weigh the blanket license's anticompetitive effects against its efficiencies and then assess the advantages and disadvantages of the source licensing alternative.

■ The anticompetitive effects of the blanket license are apparent. Copyrighted compositions are pooled and sold on an all-or-nothing basis; the selling power of one adds to that of the others and the monopoly of all is enlarged. Such "block-booking" is not new to antitrust scrutiny. See, e.g., United States v. Loew's, Inc., 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962) (package distribution of films to television stations enjoined); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (package selling of films to theater owners enjoined). The system prevents price competition between and among the pooled compositions. As discussed above, the artificial splitting of the licensing of television performing rights from the licensing of all other music rights shifts the market for performing rights from the producer level, where negotiations could be competitive, to the local station level, where the blanket license shields copyright owners from the price competition that characterizes negotiations at the source.[42] Realistic alternatives offering potential competition and consequent price restraint do not exist.[43] The local station has

---

**41.** BMI argues that the court must additionally find that defendants' practices cause the absence of alternatives, on the ground that the court could not otherwise conclude that the blanket license itself restrains trade. The argument is analytically flawed and unsupported by the CBS case. The Court of Appeals in CBS considered the availability of alternatives to be a threshold issue. That is, even if there is no price competition under the blanket licensing system, if the lack of competition endures due to customer preference then defendants cannot be held liable under the antitrust laws for restraining trade. Once it is established that users have no alternative to the blanket license and that the system does not exist by virtue of customer preference, the court may consider whether the system restrains trade. The restraint, if it then be found, is within the system. In order to prove the restraint there is no need to prove that defendants' practices proximately caused the lack of alternatives to the system. See Broadcast Music, Inc. v. Moor-Law, Inc., 527 F.Supp. 758, 766 n. 10 (D. Del. 1981), aff'd mem., 691 F.2d 490 (3d Cir. 1982).

**42.** On the strength of the expert testimony of its economist Bruce M. Owen, BMI contends that the overall price of television must be competitively set by virtue of the price competition that characterizes the licensing of synchronization and other rights at the producer level. The contention is neither factually nor theoretically tenable. The price of the synchro-nization and other rights to the music in a particular program is set competitively in negotiations between producers and copyright owners. The price of the performing rights to the music in a particular program is encompassed within the fee for the blanket license negotiated between local television stations and ASCAP and BMI. There is no evidence that the competitive limits on the price of synchronization rights exert any constraint on the price of performing rights. Nor is the court aware of any economic theory or antitrust principle that compels, or even permits, the conclusion that the sum price of a product may be considered competitively set when the sum is comprised of two parts negotiated separately in two distinct transactions, one transaction characterized by price competition, the other not. The court was therefore unpersuaded by the testimony of Mr. Owen. Indeed, the court found the impact of Mr. Owen's entire testimony significantly diminished by the fact, elicited during cross-examination, that Mr. Owen previously testified, while serving as the chief economist of the Antitrust Division of the Department of Justice, on behalf of the Government in United States v. Columbia Pictures Indus., Inc., 507 F.Supp. 412 (S.D.N.Y. 1980), that ASCAP is an anticompetitive cartel.

**43.** Ultimately, price constraint is provided not by competition but by the consent decree's provision that users may petition the district

no choice but to purchase access to the entire repertories of ASCAP and BMI although the station's needs could certainly be satisfied by a far more limited selection. The station controls neither the number nor quality of the compositions it purchases and cannot reduce its costs by reducing its use of music. The price the user pays, as Justice Stevens stated,

> is unrelated either to the quantity or quality of the music he actually uses, or, indeed, to what he would probably use in a competitive system. Rather, in this unique all-or-nothing system, the price is based on a percentage of the user's advertising revenues, a measure that reflects the customer's ability to pay but is totally unrelated to factors—such as the cost, quality, or quantity of the product—that normally affect price in a competitive market.

*BMI v. CBS,* 441 U.S. at 31, 99 S.Ct. at 1568 (Stevens, J., dissenting) (footnotes omitted).

Arrayed against these significant restraints on competition are the recognized virtues of the blanket license. *See BMI v. CBS,* 441 U.S. at 20–24, 99 S.Ct. at 1562–64. It is undisputed that these efficiencies render the blanket license pro-competitive, and even necessary, for small users such as nightclubs and restaurants who cannot predict in advance their music needs,[44] and it was in that context that the blanket license arose. A local television station's use of music is not, however, akin to that of a local tavern and analysis of the market reveals that the benefits of blanket licensing of local television stations do not balance the burdens.

Before considering these benefits and burdens, the court notes two basic problems in defendants' efficiency argument. First,

both of defendants' expert witnesses— Bruce M. Owen and William M. Landes— testified that the efficiency of the blanket license is demonstrated by the fact that it has been freely chosen by users from among available alternatives. That premises has, of course, been rejected as a matter of fact. Second, defendants have stressed the undeniable fact that the blanket license does not restrict output; indeed, the blanket license encourages the use of music by eliminating marginal costs once the license is purchased. While recognizing that the stimulus to use music is a virtue of the license, the court finds no compelling reason to give this fact the overwhelming emphasis that defendants urge. In this market, due to the absence of price competition, uncurtailed supply has no effect on prices.

The court first considers transaction costs. The blanket license permits local television stations to obtain all the music they might need via two annual negotiations between the All Industry Committee and AS-CAP and BMI. Defendants contend that any alternative to the blanket license would involve a multitude of costly transactions with individual copyright owners over music performing rights. That contention is not supported by the record. Negotiations for synchronization and other rights to the music contained in syndicated programming already occur and the evidence is clear that these negotiations would not become complicated or costly by the inclusion of television performing rights. It is only with respect to the still limited number of live and live-on-tape syndicated programs which do not require negotiation of synchronization rights that the blanket license reduces otherwise necessary transaction costs. Syndicated programming aside, defendants em-

---

court to determine a reasonable fee. Of course, even were this court somehow to determine that defendants' blanket license fees are reasonable, the system would not thereby be immune to antitrust attack. The mandate of the Sherman Act is not that courts determine reasonable prices but that courts intervene where necessary to permit free market competition to set prices. *See Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980) (per curiam); *United States*

*v. Trenton Potteries Co.,* 273 U.S. 392, 397–98, 47 S.Ct. 377, 379, 71 L.Ed. 700 (1927).

**44.** *See Broadcast Music, Inc. v. Moor-Law, Inc.,* 527 F.Supp. 758 (D. Del. 1981), *aff'd mem,* 691 F.2d 490 (3d Cir. 1982) (antitrust challenge to blanket licensing of small establishments offering live music dismissed upon finding that blanket license was necessary and that there were no efficient or even feasible alternatives).

phasize that because synchronization rights are not negotiated for most of the music contained in locally-produced programming the blanket license substantially reduces transaction costs for such programming. The court agrees that the blanket license reduces transaction costs for locally-produced programming, but disagrees as to the significance of the savings. Plaintiffs introduced into evidence uncontroverted data that establish that the music contained in locally-produced programming comprises on the average less than 10% of local stations' total use of music. The trial testimony further established that such music is comparatively insignificant not only quantitatively but qualitatively (in terms of entertainment value) as well and its proportionate use might decrease could savings result thereby. Moreover, since local stations deal directly and locally with many of the copyright owners of the music contained in locally-produced shows, it should not be assumed that without the blanket license local stations would ordinarily be obliged to travel great distances to negotiate with unknown composers or publishing companies. The court therefore finds the blanket license's transaction cost savings to be negligible regarding the vastly predominant portion of the music contained in local station programming and insignificant regarding the remainder.

The second principal benefit of the blanket license is the elimination of monitoring costs. Under the blanket licensing system, there is, of course, no need to monitor local television stations to detect the unauthorized use of music because any musical composition used would be covered by one or the other license. There is nevertheless no indication that monitoring costs would be significant under an alternative system such as source licensing. The principal purpose of defendants' current monitoring system is not to detect unauthorized music use but to discover which compositions are being performed so as to effectuate the royalty distribution system. That purpose would be vitiated under a source licensing system that would accomplish royalty distribution directly. Moreover, as plaintiffs' expert witness Dr. Paul L. Joskow explained, it is highly unlikely that local television stations would risk infringement liability in order to avoid obtaining performing rights. *See also Broadcast Music, Inc. v. Moor-Law, Inc.*, 527 F.Supp. 758, 761–62 (D. Del. 1981), *aff'd mem.*, 691 F.2d 490 (3d Cir. 1982). Under a source licensing system producers would assume the responsibility of obtaining performing rights from copyright owners and would pass the rights along to local stations. Syndicated programming would therefore not present monitoring problems. As for locally-produced programming, there is, again, no credible threat of unauthorized music use by television stations. Thus, while the blanket license reduces monitoring costs, the reduction is not significant in the context of the local television industry.

Another asserted benefit of the blanket license is that it reduces up-front costs for producers engaged in the high-risk business of packaging syndicated programs by relieving them of the need to purchase television performing rights at the same time that they obtain all other necessary music rights. The court finds this benefit insignificant. The record makes clear that performing rights fees are a miniscule percentage of the total cost of producing a syndicated program. It is therefore extremely unlikely that the additional cost of music performing rights would deter any syndicators from producing programs.

Finally, the blanket license offers users maximum flexibility by permitting the use of any song in the organization's repertory at any time without fear of copyright infringement. Such flexibility is an extremely important advantage where music use cannot be planned in advance. In the local television industry, however, the benefit is minimal. With the exception of live programming, all of the music contained in syndicated programming is, of course, selected by producers long in advance of the performance and local stations accordingly have no need for the capacity to use such music on the spur of the moment. Nor is there any indication that producers hiring composers or selecting pre-existing music

would be constrained in their selection by the fear that they might not be able to clear performing rights at the source. Although local stations would probably be constrained in their selection of music for use in locally-produced programming, the constraint would be of little import in view of the fact that the music used in such programming is quantitatively and qualitatively insignificant. The number of unplanned performances of copyrighted work on local station broadcasts of concerts or parades *et al.* is also not high.

In sum, the insignificant cost savings of the blanket license in the context of the local television industry do not balance the anticompetitive consequences of the absence of price competition.

Before issuing an injunction, the court must consider the consequences for competition in the relevant market of any such remedy. It is not substantially disputed that, should the blanket license be enjoined, source licensing would probably evolve. The court's rule of reason analysis shall therefore conclude with a brief assessment of source licensing.

█ Of principal significance, in sharp contrast to the blanket license, licensing of television performing rights at the source would permit price competition among musical compositions. The distinction is critical. The preservation of competition is the fundamental purpose of the Sherman Act whose premise is that unrestrained competition will yield the lowest prices and the best allocation of resources and will spur innovation. *See Northern Pac. R. Co. v. United States,* 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). The significance of potential disadvantages such as transaction and monitoring costs has already been considered and found negligible. It is clear to the court that source licensing would be more pro-competitive than the existing blanket license. In addition to defendants'

argument, now rejected, that the blanket license is a highly efficient means of licensing television performing rights, defendants' major objection to source licensing is that, should the blanket license be enjoined, copyright owners would surely unite to form an anticompetitive guild with minimum fees and residual rates that would be shielded from antitrust scrutiny by the labor exemption. Assuming that the unionization threat is real, the court cannot be deterred from remedying an antitrust violation by the fact that Congress has chosen for various reasons of social policy to insulate from antitrust attack activity that may result from the remedy fashioned here. The unionization threat does not therefore preserve the blanket license.

### CONCLUSION

█ For the above reasons, the court holds that the blanket licensing of music performing rights to local television stations unreasonably restrains trade in violation of Section 1 of the Sherman Act.[45] Defendants ASCAP, BMI and their respective members and affiliates must accordingly be enjoined from continuing their anticompetitive practices. Settle judgment on notice.

SO ORDERED.

---

**45.** As is clear from the foregoing, the blanket licensing system—in particular, its fee which is based on users' revenues rather than actual use—exists not for the convenience of local television stations but due to defendants' patent power. Accordingly, defendants' licensing practices must also be declared misuse of copyright. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 139, 89 S.Ct. 1562, 1585, 23 L.Ed.2d 129 (1969); *see also BMI v. Moor-Law, Inc., supra,* 527 F.Supp. at 772–73.